UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD SCHUMAKER, <br>     Plaintiff, <br> v. <br> Z. AHMED, <br>     Defendant. | Case No. 17-cv-03567-EMC <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Docket No. 32 |

## I.     INTRODUCTION

In this *pro se* prisoner's civil rights action, Donald Schumaker complains about medical care he received from Dr. Ahmed at the Correctional Treatment Facility in Soledad (CTF-Soledad). Dr. Ahmed, the sole defendant, has filed a motion for summary judgment, which Mr. Schumaker has opposed. For the reasons discussed below, Dr. Ahmed's motion for summary judgment will be granted and judgment entered in his favor.

## II.     BACKGROUND

Mr. Schumaker complains that Dr. Ahmed failed to properly address his complaints of pain and failed to timely provide a total hip replacement.

The following facts are undisputed unless otherwise noted.

A.     <u>The Parties</u>

Mr. Schumaker was an inmate in the California prison system who arrived at CTF-Soledad from another prison in or about August 2012. At the time of his arrival, he was 62 years old. He stayed at CTF-Soledad until his transfer to another prison in or about December 2015. Docket No. 46 at 1-2.

1    Dr. Ahmed was a licensed physician and board-certified in internal medicine. He was a
2    primary care physician at CTF-Soledad. Docket No. 32-1 at 1.
3    Dr. Ahmed first saw Mr. Schumaker in September 2012 and was his primary care provider
4    until June 2015, when Dr. Ahmed was assigned to another medical unit and another physician
5    took over as Mr. Schumaker's primary care provider. *See* Docket No. 32-1 (Ahmed Decl.) at 1.
6    There is no evidence that Dr. Ahmed had any responsibility for Mr. Schumaker's care after he
7    ceased being his primary care provider in June 2015.

B.   General Information About Hip Arthrosis And Its Treatment

Hip arthrosis is a type of osteoarthritis, also called degenerative joint disease. Osteoarthritis results from normal wear and tear on joints and cartilage, which naturally deteriorate with age. Old injuries and joint damage also increase a patient's risk of developing some type of arthritis. Docket No. 32-2 (Bright Decl.) at 3. Osteoathritis occurs most often in patients age 50 and older. Docket No. 32-1 at 2. "Mild to moderate hip arthrosis is very common among older patients, but it usually does not significantly impair their daily lives." *Id.*

Undisputed evidence about the course of care for arthritis was provided by Dr. Bright, who stated in his declaration:

> There is no cure for osteoarthritis. The course of treatment must be determined on a case by case basis depending on the patient's individual circumstances, such as the patient's level of pain, the extent to which the pain limits the patient's ability to carry out normal daily activities, the patient's age, weight, and the ability to manage the symptoms of osteoarthritis with nonsurgical methods. Some common treatments known to effectively manage pain and improve or maintain flexibility include nonsteroidal anti-inflammatory drugs (NSAIDs) to treat pain, physical therapy exercises and stretches and, if necessary, joint replacement surgery.
>
> Nonsurgical treatments for hip arthrosis are preferred before considering surgical options such as total hip replacement surgery. That is because surgery places significant stress on the body and patients who are older or in generally poor health are at a higher risk for developing serious post-operative complications like infections, blood clots, or greater joint degeneration. The American Academy of Orthopaedic Surgeons (AAOS) practice guidelines strongly recommend the use of nonsurgical treatments like NSAIDs and physical therapy exercises prior to surgical intervention. [Citation omitted.]
>
> Hip osteoarthritis or mild degenerative joint disease can be

> diagnosed, among other ways, with x-ray imaging. Occasionally, if conservative treatments are ineffective at managing the patient's pain, a computed tomography (CT) scan can be taken to provide a better look at the condition of the bone and soft tissues of the hip.

Docket No. 32-2 at 3.

Dr. Ahmed explained in his declaration why hip-joint surgery is not taken lightly and is rarely the first option. Docket No. 32-1 at 3. Like other surgeries, hip-joint surgery causes significant trauma to the body and not all hip-joint surgeries are successful. Some of the risks of surgery are infection, potentially fatal blood clots, or even greater instability of the joint leading to the need for another surgery. Patients who are older or in poor health are at a higher risk for such surgical complications. "Because of the stress surgery places on the body, noninvasive treatments such as medications, lifestyle changes, and physical therapy are used whenever they are available and can effectively manage the patient's condition." Docket No. 32-1 at 3.

C.  Dr. Ahmed's Care For Mr. Schumaker

Over the course of the 33 months that Dr. Ahmed was his PCP, Mr. Schumaker submitted nine health care request forms in which he complained of severe hip pain. Docket No. 44 at 14, 16-23.[1] There is no evidence that Dr. Ahmed actually saw any of the health care request forms, however. Health care request forms are usually screened by a nurse, who evaluates the patient and schedules a physician visit if necessary. Docket No. 32-1 at 4-5. Dr. Ahmed would not normally see health care request forms and does not recall seeing any particular forms from Mr. Schumaker. Docket No. 32-1 at 5. Regardless of whether Dr. Ahmed saw those health care request forms, Mr. Schumaker states that he also "continually complained" to Dr. Ahmed of "intense pain." Docket No. 46 at 2.

Dr. Ahmed saw Mr. Schumaker on fourteen occasions during the 33 months he was Mr. Schumaker's primary care provider. During none of these visits did Dr. Ahmed turn the patient away without providing some sort of care.

---

[1] Mr. Schumaker submitted two health care request forms about his hip pain in 2012, one in 2013, one in 2014, and six in 2015. *See* Docket No. 44 at 14, 16-23. There were long periods during which Mr. Schumaker did not submit health care request forms, such as during the nine months from December 2012 through September 2013, and the 13 months from October 2013 through November 2014. *See id.*

3

Mr. Schumaker submitted his first health care request form complaining about hip pain in September 2012. On September 25, 2012, Dr. Ahmed examined Mr. Schumaker for the first time. Dr. Ahmed ordered an x-ray of the right hip to determine the source of the pain and whether urgent treatment was needed. Dr. Ahmed also prescribed indomethacin (a nonsteroidal anti-inflammatory drug (NSAID)) for pain management, and scheduled a follow-up visit in 90 days. Docket No. 32-1 at 4. The x-ray was taken two days later, and the radiologist's report stated this impression: "No acute fracture or dislocation. Mild degenerative change of the right hip joint is identified." Docket No. 32-4 at 43. According to Dr. Ahmed, the mild degenerative change of the hip is normal for a patient of Mr. Schumaker's age. Dr. Ahmed declares that (a) Mr. Schumaker was not at this time at immediate risk for significant loss of daily independent function and (b) pain management medication was an appropriate medical treatment. Docket No. 32-1 at 4.

According to Mr. Schumaker, Dr. Ahmed told him at that time that "there is nothing wrong with me." Docket No. 46 at 1. Dr. Ahmed does not recall such a conversation. Docket No. 32-1 at 9. For summary judgment purposes, the court accepts the nonmovant's version of the facts as true, i.e., that Dr. Ahmed said there was "nothing wrong" with Mr. Schumaker. Regardless of what Dr. Ahmed stated, Mr. Schumaker does not dispute that Dr. Ahmed examined him, ordered an x-ray, prescribed an NSAID for pain management, and scheduled him for a follow-up appointment in three months.

Dr. Ahmed saw Mr. Schumaker three months later, on December 26, 2012. In response to Mr. Schumaker's complaints that he disliked indomethacin, they agreed to replace the indomethacin with naproxen, another common NSAID used to treat chronic pain. In Dr. Ahmed's opinion, "this was a medically appropriate treatment and was consistent with the CDCR Pain Management Guidelines for treating chronic pain." Docket No. 32-1 at 4.

Dr. Ahmed next saw Mr. Schumaker for a routine follow-up on April 22, 2013. Dr. Ahmed thought Mr. Schumaker's hip pain appeared to be effectively managed with an NSAID and that no further medical intervention appeared necessary. Docket No. 32-1 at 5.

On September 18, 2013, Mr. Schumaker filed a health care request form complaining of back and hip pain. Dr. Ahmed saw Mr. Schumaker on October 7, 2013, at which time Mr.

Schumaker told him the pain worsened when he stood straight and lessened when he bent forward. Mr. Schumaker had full range of motion of the hip and presented no signs of leg weakness and had been able to walk to the clinic. Dr. Ahmed ordered x-rays of the lower back and hips to check whether there was deterioration of the joints. Dr. Ahmed also continued the naproxen prescription. Docket No. 32-1 at 5.[2] The report on the x-ray done four days later showed no serious bone abnormalities, noted mild to moderate degenerative changes in the disks in the lower back as well as an old deformity on the right side of the pelvis (that was later revealed to be from a 1985 motorcycle accident), and stated that the "hips are normal." Docket No. 32-4 at 45. It appeared to Dr. Ahmed that Mr. Schumaker's pain was due to the degenerative disk disease in his lower back. Dr. Ahmed was of the opinion that Mr. Schumaker was not at risk for significant loss of independent function or impairment of daily living activities due to pain at the time. Docket No. 32-1 at 5.

On October 30, 2013, Dr. Ahmed saw Mr. Schumaker to discuss the x-ray findings. Dr. Ahmed prescribed pain medications and showed Mr. Schumaker some stretches for his leg and back that he believed would help with the pain and stiffness. Dr. Ahmed did not believe more powerful opioid medication was appropriate due to Mr. Schumaker's history of drug abuse. Dr. Ahmed was of the opinion that the NSAIDs and stretches were an appropriate course of medical treatment for chronic pain and were consistent with CDCR policies. Docket No. 32-1 at 6.

---

[2] Mr. Schumaker declares that, on October 7, 2013, Dr. Ahmed "noted that I may need an MRI in his notes, but never followed through with his own recommendation." Docket No. 46 at 1. Mr. Schumaker is correct that an MRI is mentioned in Dr. Ahmed's notes, but reads the phrase out of context. The MRI is mentioned in the portion of the notes pertaining to Mr. Schumaker's chronic-lower-back-pain complaints rather than the hip-pain complaints. The relevant portion of Dr. Ahmed's notes states:

> "Bil hip pain ? DJD – xray of 10/2012
>     Will rept. the xray.
> "C.L.B.P. – DDD [illegible] sp. canal stenosis (Pt feels
>     better [with] flexion.
>     Xray -*may* need to do *MRI*."

Docket No. 32-4 at 5; *see generally* Stedman's Medical Abbreviations, Acronyms & Symbols (5th ed. 2013) at 228 ("DDD" entry) and 509 ("LBP" entry). Even if the MRI reference in Dr. Ahmed's notes did pertain to hip pain, the reference does not state that an MRI was medically necessary at that time but only something the doctor contemplated as a future possible course of action.

5

Dr. Ahmed saw Mr. Schumaker on February 19, 2014 for a follow-up visit. Dr. Ahmed believed that the NSAID pain medication and light exercise and stretching were effectively controlling the hip pain and allowing Mr. Schumaker to function independently and to engage in the normal activities of daily living. No further medical intervention appeared warranted to Dr. Ahmed. Docket No. 32-1 at 6.

On May 20, 2014, Dr. Ahmed saw Mr. Schumaker, who had full range of motion at the hip joint but complained that his hip pain had flared up in the last two weeks. Dr. Ahmed believed the hip pain was secondary to the degenerative disk disease in the lower back; he also was aware that the hip arthrosis may have been worsening so he ordered another hip x-ray, continued the NSAID, and recommended warm compresses to manage the pain. Docket No. 32-1 at 6. The report for the x-ray, which was done two days later, listed the radiologist's impression as: "mild right hip arthrosis." Docket No. 32-4 at 46.

Dr. Ahmed saw Mr. Schumaker on June 17, 2014, by which time Mr. Schumaker had a limited range of motion at the hip and was in pain when he stood after sitting for awhile. Dr. Ahmed learned at this visit that Mr. Schumaker had fractured his pelvis in a motorcycle accident in 1985. Dr. Ahmed continued the NSAID, requested a physical therapy consult, and prescribed Baclofen for ten days. Baclofen is a nonformulary muscle relaxant that Dr. Ahmed prescribed because Mr. Schumaker's pain had worsened to the point NSAIDs were not enough to adequately treat the pain. The CDCR's Pain Management Guidelines restrict Baclofen to a 10-day supply for treating acute pain. *See* Docket No. 32-1 at 7. Dr. Ahmed states that long-term prescriptions of Baclofen "may be available for chronic spasms due to a spinal cord injury, but for a patient with mild hip arthrosis like Mr. Schumaker, long-term use of Baclofen would provide no long-term benefit," even if it was available. *Id.*

Mr. Schumaker saw a physical therapist on June 27, 2014. The physical therapist's note from the visit provides basic information about Mr. Schumaker's condition and appears to state that the inmate with a current exercise program "will not benefit from PT services – recommend ortho consult. DC from PT services." Docket No. 44 at 25. Dr. Ahmed did not seek an orthopedic consult in response to this recommendation from the physical therapist.

6

Dr. Ahmed saw Mr. Schumaker again on August 20, 2014, for a follow-up. Mr. Schumaker had a reasonable range of motion at the hip and said the NSAID medication helped but did not cure the pain. Dr. Ahmed continued the NSAID and instructed Mr. Schumaker to avoid exertional exercise. Dr. Ahmed opines that this was "an appropriate medical treatment plan" because the medication and light exercise appeared to be managing Mr. Schumaker's pain reasonably well. Docket No. 32-1 at 7.

Starting in November 2014, Mr. Schumaker's symptoms began to change course. On November 11, 2014, Mr. Schumaker complained of hip pain *and* a loss of feeling in his right leg in a health care request form. Dr. Ahmed saw him on November 21, 2014, and noted that the NSAIDs were no longer helping the persistent hip pain. Because Mr. Schumaker had had only one physical therapy visit, Dr. Ahmed ordered another physical therapy visit to help assess Mr. Schumaker's condition and determine whether the pain was due to further joint degeneration. *Id.* at 8.

According to Mr. Schumaker, Dr. Ahmed "was hostile and kept denying there was anything wrong with me." Docket No. 46 at 1. For summary judgment purposes, the court accepts the nonmovant's version of the facts as true, i.e., the court accepts that Dr. Ahmed had a hostile attitude and told Mr. Schumaker there was nothing wrong with him. Regardless of Dr. Ahmed's attitude and words, Mr. Schumaker does not dispute that, as of this November 11, 2014, visit, Dr. Ahmed had been prescribing NSAIDs for pain management for more than two years, had ordered x-rays on three different occasions, and was making a second referral for physical therapy.

A physical therapist saw Mr. Schumaker on December 1, 2014. This physical therapist's report stated that Mr. Schumaker (a) expressed his belief that he did not need physical therapy because he did exercises and stretches on his own and (b) wanted an MRI and surgery. Docket No. 32-4 at 55.

Mr. Schumaker filed a health-care appeal on January 22, 2015, requesting, among other things, an MRI and an orthopedic consult. Docket No. 32-4 at 278-81. These inmate-appeal requests were denied by a physician other than Dr. Ahmed. *Id.* at 283-84.

An MRI or a CT-scan may provide a better look at a patient's soft tissue and bones.

7

Docket No. 32-1 at 8. Advanced imaging services like an MRI or CT-scan are specialty services that are more difficult to obtain, and the prisoner must be transported to an outside facility where the services are available. The California Correctional Health Care Services (CCHCS) policy requires physicians' orders, InterQual criteria approval, and approval by the Chief Physician or Chief Medical Executive for an inmate to receive these specialty services. Docket No. 32-1 at 8; Docket No. 32-2 at 3-4.

Mr. Schumaker was scheduled for a visit with Dr. Ahmed and Dr. Bright (the prison's chief physician and surgeon) to determine if a CT-scan was medically necessary. Dr. Bright examined Mr. Schumaker on March 13, 2015, in Dr. Ahmed's presence. Dr. Bright agreed that Mr. Schumaker's hip pain appeared as though it could no longer be effectively managed by medication and stretches. Dr. Ahmed then referred Mr. Schumaker for a CT-scan, and Dr. Bright approved the referral. Docket No. 32-1 at 8-9.

A CT-scan was done on April 3, 2015. The CT-scan showed an old fracture of the right pelvis, and found mild to moderate right hip arthrosis, consistent with the diagnosis from the x-rays done on May 22, 2014. Docket No. 32-1 at 9; Docket No. 32-4 at 47.

Dr. Ahmed, Dr. Bright and Mr. Schumaker discussed the next steps of treatment on April 17, 2015. The doctors agreed to refer Mr. Schumaker for an orthopedic consult. Docket No. 32-1 at 9; Docket No. 32-4 at 57.

Mr. Schumaker was seen by Dr. Kowall for an orthopedic consultation on May 13, 2015. In his report, Dr. Kowall reportedly recommended that Mr. Schumaker be referred to tertiary care because it was unclear if his pain was due to hip osteoarthritis or pelvic malunion, which is another bone abnormality that occurs when a fracture heals in a deformed way, causing pain. *See* Docket No. 32-1 at 9.

On May 19, 2015, per Dr. Kowall's recommendation, Dr. Ahmed referred Mr. Schumaker for tertiary care at the University of California - San Francisco hospital to determine the source of the pain. This was the last time Dr. Ahmed treated Mr. Schumaker as his primary care provider. Docket No. 32-1 at 9; Docket No. 32-4 at 59.

The most recent medical records in the file with Dr. Ahmed's name and stamp on it are

1  dated May 19, 2015.  The May 19, 2015 documents include the progress notes, the medication
2  reconciliation form, and the Physician Request For Services form seeking a referral to a tertiary
3  care center.  Docket No. 32-4 at 17, 41, 59.[3]

In addition to the NSAIDs (first indomethacin and later naproxen) prescribed by Dr.
Ahmed throughout the 33 months that Mr. Schumaker was his patient, Dr. Ahmed also prescribed
acetaminophen from February 2014 through June 2015, at which point he was no longer assigned
as Mr. Schumaker's primary care physician.  Docket No. 32-4 at 28-40.

Mr. Schumaker states that he received another orthopedic consult on August 7, 2015, at
San Joaquin General Hospital, and that the orthopedist recommended a total hip replacement.
Docket No. 46 at 2.[4]  Mr. Schumaker was transferred to a prison in Southern California on
December 4, 2015.  *Id.*  He received a hip replacement on April 18, 2016.  Docket No. 1 at 7-8.

### III.     VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions
giving rise to the complaint occurred at a prison in Monterey County, which is located within the
Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  The Court has federal question jurisdiction over
this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

### IV.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there
is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as
a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party
who fails to make a showing sufficient to establish the existence of an element essential to that
party's case, and on which that party will bear the burden of proof at trial . . . since a complete

---

[3] The copy of the Physician Request For Services form submitted by Dr. Ahmed only has the top half of the form filled out.  Docket No. 32-4 at 59.  The copy submitted by Mr. Schumaker has both the top and bottom halves of the form filled out, with further information provided about the result of the consultation, and lists Jerry Crooks, MD as Mr. Schumaker's primary care provider as of August 7, 2015.  Docket No. 44 at 43.

[4] Mr. Schumaker declares that the orthopedist he saw on May 13, 2015, recommended a total hip replacement.  Docket No. 46 at 2.  In his complaint, Mr. Schumaker alleges that the orthopedist on May 13, 2015 "recommended 'refereal to Terian care center (U.C.S.F.)."  Docket No. 1 at 7 (errors in source).  The orthopedist's notes from May 13, 2015, are not in the file.

9

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Schumaker's complaint is not made under penalty of perjury and therefore is not considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See id*. at 631.

### V. DISCUSSION

A. Eighth Amendment Claim

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth

Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

### 1. Objective Prong

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted).

There is evidence in the record that Mr. Schumaker had arthritis in his hip that caused him pain for several years. On this record, a reasonable jury could conclude that his hip problems satisfied the Eighth Amendment's objective prong.

### 2. Subjective Prong

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (although surgery was not done until three months after prisoner's need for back surgery was unambiguously diagnosed and over three years after the injury, defendants were entitled to summary judgment because plaintiff did not raise a triable issue that these defendants were responsible for the delay), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

Negligence does not amount to deliberate indifference and does not satisfy the subjective

prong of an Eighth Amendment claim. S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

A difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (second alteration in original).

Prison officials cannot avoid Eighth Amendment liability by simply declaring that they disagree with a specialist's or treating doctor's prescribed course of care. The limits of the difference-of-opinion rule were illustrated in *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), where the Ninth Circuit determined that the district court erred in granting summary judgment for defendants who argued that their refusal to approve double hip-replacement surgery for a prisoner who could barely walk due to hip pain showed a mere difference of opinion. In *Snow*, the prison medical committee repeatedly refused to authorize a double hip-replacement surgery, even though an orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency. *See id.* at 986. Not only had the medical committee refused to authorize the surgery, the committee "gave no medical reason for the denials" and some evidence suggested the refusal was due to the warden's dislike of death row prisoners such as the plaintiff. *Id.* at 986-87. *Snow* rejected the defendants' argument that their choice to treat the prisoner with medications rather than surgery showed merely a difference of opinion that did not amount to an Eighth Amendment violation. *Id.* at 987-88. Although there was "clearly a difference of medical opinion," the evidence in the record and inferences therefrom could allow a reasonable jury to "conclude that

12

the decision of the nontreating, nonspecialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id.* at 988. Significantly, the defendants sent the prisoner for evaluation by orthopedic surgeons, both of whom recommended double hip-replacement surgery. *Id.* One of those surgeons testified at his deposition that the prisoner's likelihood of success after the surgery was very high, that surgery would help improve the prisoner's health and mobility, and that the surgery would allow the prisoner to avoid the use of the medications that were causing other health problems for the prisoner. On this record, "it should be for the jury to decide whether any option other than surgery was medically acceptable." *Id.* The court acknowledged that "a medication-only course of treatment may have been medically acceptable for a certain period of time," but saw the multi-year delay in approving the recommended surgery as presenting a triable issue as to medical acceptability of defendants' course of treatment under the circumstances. *Id.*

*Snow* did not hold that a triable issue is shown whenever prison officials fail to follow a doctor's recommended course of care. Indeed, *Snow*'s discussion shows that it was the unthinking denial without medical reason by prison officials that could allow a jury to conclude that the prison officials had acted with deliberate indifference to that inmate's medical need. The Ninth Circuit distinguished Snow's situation from that in *Toguchi*, where the plaintiff challenged the defendant-doctor's choice to discontinue a particular medication but did not present expert testimony showing that the discontinuation of the medication was medically unacceptable, and the defendant-doctor had submitted expert testimony that her actions met the standard of care. *See Snow*, 681 F.3d at 988-89 (citing *Toguchi*, 391 F.3d at 1055-56). The Ninth Circuit also distinguished *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), on the basis that "only one prison doctor told the inmate that surgery would be necessary" in *Sanchez*, whereas "the consistent recommendation by two outside specialists over the course of three years" in *Snow* was that the prisoner needed double hip-replacement surgery to alleviate his severe pain and mobility issues. *Snow*, 681 F.3d at 989. *Accord Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (finding that case did not involve simply a difference of opinion because evidence showed defendants ignored the recommendations of treating specialists that plaintiff needed cataract surgery and

13

relied instead on nonspecialist/nontreating medical officials to make decisions based on an administrative policy that cataract surgery would not be provided when other eye was functional).

In the present case, there is at best a difference of opinion between patient and doctor as to the proper course of care. Plaintiff disagrees with the course of care pursued by Dr. Ahmed, but completely fails to present any evidence that the course of care pursued by Dr. Ahmed was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Mr. Schumaker's health. *See Toguchi*, 391 F.3d at 1058. No reasonable jury could find in Mr. Schumaker's favor on the evidence in the record.

There is no evidence on which a reasonable jury could rely to conclude that Dr. Ahmed was deliberately indifferent to Mr. Schumaker's hip problems in the 33 months that Dr. Ahmed was his primary care provider. First, the undisputed evidence shows that Dr. Ahmed referred Mr. Schumaker to an orthopedic specialist when it became appropriate. It is undisputed that: (a) no doctor recommended an orthopedic consultation until Dr. Ahmed and Dr. Bright determined in April 2015 that an orthopedic consultation would be beneficial[5]; (b) the initial orthopedic consultation occurred on May 13, 2015, at which time the orthopedist recommended that Mr. Schumaker be referred to tertiary care because of the unclear source of his pain; (c) on May 19, 2015, within less than a week of that first orthopedic consultation, Dr. Ahmed made the referral for Mr. Schumaker to be sent to tertiary care at University of California – San Francisco; and (d) Dr. Ahmed did not see or treat Mr. Schumaker after May 19, 2015. Second, the undisputed evidence shows that Dr. Ahmed consistently prescribed medication for pain relief. It is undisputed that Dr. Ahmed prescribed medications to address Mr. Schumaker's complaints of pain during the entire 33 months: NSAIDs for the whole time plus acetaminophen for the last fifteen months. Mr. Schumaker obtained some relief from the medication. Moreover, as noted above, the

---

[5] Although a physical therapist recommended on June 27, 2014, an orthopedic consultation, there is no evidence that a physical therapist is in a superior position to the primary care provider to determine when an orthopedic consultation is needed. No case has held a physician acts with deliberate indifference in not accepting the recommendation of a physical therapist in this regard.

This is not a case like *Snow* and *Colwell* where the medical care people who were recommending the treatment were MDs and specialist MDs. *See Colwell*, 763 F.3d at 1069; *Snow*, 681 F.3d at 988.

14

American Academy of Orthopaedic Surgeons practice guidelines disfavor surgery in favor of nonsurgical treatments like NSAIDs and physical therapy exercises. *See* http://newsroom.aaos.org/media-resources/news/aaos-releases-new-clinical-practice-guideline-for-osteoarthritis-of-the-hip.htm; https://www.aaos.org/uploadedFiles/PreProduction/Quality/Guidelines_and_Reviews/OA%20Hip%20CPG_3.13.17.pdf. Third, the undisputed evidence shows that Dr. Ahmed also recommended stretching and exercise as care for the complaints of hip pain: Dr. Ahmed showed Mr. Schumaker some stretches on one occasion and twice referred him for physical therapy. It appears this provided some relief because the plaintiff said he didn't need additional physical therapy because he was already doing a home exercise program and stretching. Fourth, the undisputed evidence shows that Dr. Ahmed ordered imaging studies on several occasions. Dr. Ahmed ordered x-rays on three occasions – September 2012, October 2013, and May 2014 – and none of the x-rays showed anything more than mild arthritis in the hip. Up until this point there was no clear indication of a need for a CT-scan.

Although Plaintiff wanted more things done sooner, Dr. Bright and Dr. Ahmed did not determine until March 2015 that advanced imaging was appropriate and a CT-scan was thus ordered by them because it was medically appropriate. Dr. Ahmed ordered a CT-scan in April 2015 and referred Mr. Schumaker to an orthopedic consultation the next month after the CT-scan showed "mild to moderate" arthritis in the hip. Fifth, although an MRI was not done, there is no evidence that any physician ever recommended an MRI. As noted above, the only mention by Dr. Ahmed of the possible need for an MRI is for the back problems, not the hip.

Viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr. Schumaker, no reasonable jury could find that Dr. Ahmed was deliberately indifferent to Mr. Schumaker's hip problems.

Mr. Schumaker offers up several arguments in opposition to the motion for summary judgment, but none of his arguments warrant rejection of the motion. First, Mr. Schumaker apparently wanted surgery from the time he made his very first complaint of hip pain in September 2012. But he presents no evidence that a specialist doctor ever recommended surgery during the

ensuing 33 months when Dr. Ahmed was his primary care provider. The patient's personal preference does not set the Eighth Amendment standard. The difference of opinion between Mr. Schumaker and Dr. Ahmed as to the proper course of care does not show deliberate indifference. Unlike the *Snow* and *Colwell* cases mentioned above, there was no specialist recommending treatment that the nonspecialist defendant refused to provide.

As noted above, one of the physical therapists did recommend in June 2014 that Mr. Schumaker be sent for an orthopedic consultation, but there is no evidence that treating physician Dr. Ahmed was in an inferior position to the physical therapist to determine whether an orthopedic consultation was appropriate at that time. The evidence does not show that the physical therapist had a superior level of expertise, unlike the orthopedic surgeon in *Snow* and the ophthalmologist in *Colwell*. Moreover, Dr. Ahmed had reason to believe such a referral was unnecessary. Mr. Schumaker said at the next appointment that NSAIDs helped the pain (although they did not cure it) and had a reasonable range of motion in the hip joint. The medication and light exercise appeared to Dr. Ahmed to be managing Mr. Schumaker's pain reasonably well and were thought by him to be an appropriate medical treatment plan at that time. Dr. Bright also gave his professional medical opinion that Dr. Ahmed's course of care "was an appropriate course of treatment and is consistent with CDCR Pain Management Guidelines as well as recommendations of the AAOS." Docket No. 32-2 at 5. Thus, at most, Mr. Schumaker demonstrates a difference of opinion between the physical therapist who examined him once and his long-term treating physician as to whether an orthopedic consultation was then necessary. That sort of difference of opinion would not allow a reasonable trier of fact to conclude that Dr. Ahmed was deliberately indifferent in not ordering an orthopedic consultation in June 2014 because Dr. Ahmed had a medical basis for not making the referral. Mr. Schumaker has not presented evidence that Dr. Ahmed's course of care was medically unacceptable.

With regard to the physical therapist's recommendation, Mr. Schumaker's case is similar to *Sanchez v. Vild*, 891 F.2d 240, where the court rejected the plaintiff's argument that deliberate indifference was shown because prison officials did not perform surgery after one doctor recommended it. The Ninth Circuit determined that deliberate indifference was not shown

16

because subsequent medical personnel did not recommend surgery and the prisoner received extensive treatment for his medical condition that cleared up and then recurred. *Id.* at 242. Likewise, the evidence in this case shows that, after the physical therapist recommended an orthopedic consult, other medical staff did not recommend such a consult and Mr. Schumaker's condition appeared to be managed with the nonsurgical treatment, although it eventually worsened. After it worsened and it appeared Mr. Schumaker's pain could no longer be managed by medication and exercise, Drs. Ahmed and Bright referred Mr. Schumaker for an orthopedic consult. Prior to that referral, as in *Sanchez*, the difference of medical opinion regarding treatment for Mr. Schumaker did not amount to deliberate indifference. *Id.*

Second, Mr. Schumaker appears to believe that the fact that he received a hip replacement in April 2016 means that he needed a hip replacement since he first complained of pain in September 2012. *See* Docket No. 44 at 4. But he provides no competent evidence to support his layman's theory that arthritis is a static ailment. The medical record shows deterioration in his condition occurred over time. Nor does he present any evidence to contradict defendant's evidence that joints deteriorate with age. Moreover, he does not dispute defendants' evidence that the normal, medically accepted, course of treatment for arthritis is to address it with non-surgical methods before resorting to surgical treatment as Dr. Bright testified.

Third, Mr. Schumaker also urges that the x-rays and CT-scan showed that he needed a total hip replacement. Docket No. 44 at 9. This is the sort of speculation without any competent supporting evidence that plagues Mr. Schumaker's case. There is no evidence that Mr. Schumaker has any medical training or is otherwise competent to opine as to the appropriate care of hip problems.

Finally, Mr. Schumaker cites to several cases that he claims show his constitutional rights were violated. Docket No. 44 at 11. None of the cases help him. He cites "*Lopez v. Flores*, (10/18/2013)" (Docket No. 44 at 11), but provides no volume and page citation for the case that this Court cannot find on Westlaw with the information provided, i.e., there is no federal case by that name in 2013 or later addressing a medical issue. Two other cases he cites are out-of-circuit district court decisions that are factually distinguishable and therefore don't support a conclusion

17

that Mr. Schumaker's Eighth Amendment rights were violated. In *Baker v. Wilkinson,* 635 F. Supp. 2d 514 (W.D. La. 2009), the court found triable issues on the deliberate indifference claim where prison officials had failed to schedule hemorrhoid surgery *that a doctor had prescribed. Id.* at 516, 521. Contrary to Mr. Schumaker's assertion (*see* Docket No. 44 at 11), *Baker* did not involve hip surgery. In *West v. Keve*, 541 F. Supp. 534, 539-41 (D. Del. 1982), the court held that defendants were entitled to qualified immunity because they acted in subjective good faith in failing to schedule surgery recommended by a doctor 17 months earlier for a severe case of varicose veins. Mr. Schumaker also cites to *McGuckin v. Smith*, 974 F.2d 1050, a case mentioned earlier in this order in which the court upheld summary judgment for two doctors because plaintiff had not raised a triable issue that those doctors were responsible for the delay in treatment where the "medical need for surgery [for a herniated disk] was unambiguously diagnosed" by a doctor and then was delayed for several months. 974 F.2d at 1061-62. The cases are distinguishable because *Baker, West*, and *McGuckin* all involved situations where doctors had prescribed or recommended surgery; by contrast, in Mr. Schumaker's case, no doctor had recommended surgery until after Dr. Ahmed stopped being Mr. Schumaker's treating physician. Moreover, in *West* and *McGuckin*, the defendants prevailed because of a lack of evidence they were responsible for the delay in recommended surgery.

Mr. Schumaker fails to present evidence that would allow a reasonable jury to find that Dr. Ahmed was deliberately indifferent to his hip care needs. Unlike the situation in *Snow*, and like the situation in *Toguchi*, Dr. Ahmed presents evidence that the chosen course of care was medically acceptable. And, as in *Toguchi*, Mr. Schumaker does not present expert evidence to show that Dr. Ahmed's decisions were medically unacceptable and made in conscious disregard of an excessive risk to his health. Even when the evidence is viewed in the light most favorable to Mr. Schumaker, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against Dr. Ahmed on the Eighth Amendment claim. Dr. Ahmed therefore is entitled to judgment as a matter of law on the Eighth Amendment claim.

B. <u>Qualified Immunity</u>

The defense of qualified immunity protects "government officials . . . from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (internal citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The evidence in the record does not establish that Dr. Ahmed violated Mr. Schumaker's constitutional rights in responding to his hip problems. Dr. Ahmed prevails on the first prong of the *Saucier* analysis. Dr. Ahmed is entitled to judgment as a matter of law on the qualified immunity defense.

///
///
///
///
///
///
///

19

## VI. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED.** Docket No. 32. Defendant is entitled to judgment in his favor on the Eighth Amendment claim as well as on the defense of qualified immunity for that claim. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: March 14, 2019

EDWARD M. CHEN
United States District Judge